**IN THE COURT OF APPEALS OF IOWA**

No. 24-0398
Filed May 21, 2025

**IN RE THE MARRIAGE OF CARRIE E. SULENTIC**
**AND JAMES R. SULENTIC**

**Upon the Petition of**
**CARRIE E. SULENTIC,**
        Petitioner-Appellant,

**And Concerning**
**JAMES R. SULENTIC,**
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Black Hawk County,

Kellyann M. Lekar, Judge.


        A former spouse appeals the distribution of assets and denial of expert and

attorney fees in a dissolution of marriage decree.  **AFFIRMED AS MODIFIED.**


        Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West

Des Moines, for appellant.

        John J. Wood of Beecher, Field, Walker, Morris, Hoffman & Johnson, P.C.,

Waterloo, for appellee.


        Considered without oral argument by Greer, P.J., and Buller and

Langholz, JJ.

**BULLER, Judge.**

Carrie Sulentic appeals the division of property in the decree dissolving her marriage with James (Jim) Sulentic. She also makes claims regarding trial attorney and expert witness fees and requests appellate attorney fees. We find the increased net value of a limited liability company (LLC) formed during the marriage with the spouses as members should have been considered marital property, and we modify the decree accordingly. We otherwise affirm the district court and deny Carrie's request for appellate attorney fees.

## I. Background Facts and Proceedings

In late 2015, Carrie and Jim entered into what was the second marriage for both. They had been dating since 2011—shortly after Jim's first wife died and during Carrie's first divorce. The couple did not have any children together; Carrie has three children from her prior marriage, and Jim does not have any children.

At the time the couple entered into the marriage, Jim was fifty-five years old. He had significant premarital assets, including several houses he owned through a personal LLC in and around Waterloo and a real estate business he built with his first wife and later a business partner. After his first wife's death, Jim used money she had saved to embark on a separate real estate business relationship with Brent Dahlstrom buying, selling, and developing properties under a series of LLCs. Jim's net worth at the time of his marriage to Carrie was more than $5 million.

Carrie was thirty-eight years old when she married Jim. She had worked as a real estate agent while they were dating, and in 2014 she went to work as a marketing manager for a company operating out of the University of Northern Iowa. Carrie shared custody of her three then-minor children with her ex-husband. She

rented her home at a below-market rate from Jim, drove a leased car for which Jim helped with the down payment, and had some student loan debt.

Carrie and Jim could not come to an agreement on the terms of a prenuptial agreement—particularly as to jointly titling Jim's premarital property—and so they did not sign one. The newly-married couple made their home in one of Jim's properties and did an "extensive remodel." They continued to travel frequently, spending freely on their trips and shopping. In 2017, the couple purchased a second home in Clear Lake—the only property that was in both their names. This house was sold during the dissolution proceedings, with the proceeds from the sale placed in escrow pending the decree.

According to Carrie, Jim "authored [their] lifestyle," both before and during the marriage. Jim gave generous gifts to Carrie, provided a $2500 monthly allowance, and took her on "expensive vacations"—some of which included shopping without "any discussion about spending limits." In 2017, Carrie left her job; Jim encouraged her to not find further employment to make traveling easier and help with family obligations. Around that time, Jim increased Carrie's allowance to $5000 a month, which she used for her own expenses and some of her children's expenses. In 2018, Jim retired from his first real estate business and began selling his properties to continue to fund their lifestyle. Carrie described her post-employment occupation as acting as Jim's personal assistant, errand running, and helping Jim with technology. Jim bought a house for Carrie's parents to live in (paying below-market rent), bought her and two of her children vehicles, and later rented an apartment to one of her children at below-market rate. Carrie described Jim as sometimes having a "rage-filled meltdown" about aspects of their

lifestyle straining their resources, but he would then calm down about it. Jim described it as telling "her repeatedly that this lifestyle was not sustainable. It could not go on forever with both of [them] not working."

Jim's LLCs with Dahlstrom have significant loans on them. The partners "move money constantly from one account to another. All the time." Sometimes they shift funds from one project (or LLC) to another to make mortgage and contractor payments when due (or overdue). Dahlstrom is the partner in charge of the financials for the LLCs. In 2017 and 2018, Jim's businesses with Dahlstrom bought several properties in and around Clear Lake and the Waterloo-Cedar Falls area. Jim borrowed significant cash from Dahlstrom and their companies to fund his and Carrie's lifestyle—estimated at between $25,000 to $50,000 per month while they had the Clear Lake property—because he did not have a stable income. He fell behind on his obligations to the businesses as time passed.

In 2017, Jim formed a new company—Carrie James LLC—to purchase a gas station location in Missouri for $5 million. Carrie asserted she "was a full part owner of that property," while Jim insisted he owned the entire LLC. The LLC's tax filings show Jim has 99% ownership interest and Carrie has 1% ownership interest. The $1 million down payment was funded through Jim taking out a large loan and using equity on some of his premarital properties—while Carrie did not contribute any funds. The LLC entered a twenty-year lease with the gas station company which covered the mortgage payments and some income. The lending bank advised it did not want Carrie on the loan based on her credit and income history. The purchase and associated rent payments were "intended long term to eventually fund our lifestyle ongoing and our retirement." Jim's accountant John

Adams explained the LLC used accelerated depreciation, resulting in a net operating loss used for years to offset gains from other sources—the Sulentics had not had to pay income tax since 2017.

In 2020, the couple hit some rough patches, particularly in disagreements over their finances, and they eventually agreed they should divorce. In early 2021, Carrie petitioned to dissolve the marriage. The court ordered Jim to pay her $7000 per month in temporary spousal support. Carrie remained in the marital home while Jim lived in one of his other properties; Jim continued to pay the mortgage on the marital home. Carrie began to pay the utilities on the house in 2022.

Carrie appears to have made little to no attempt to obtain full-time employment, not returning to either her real estate or marketing careers during their separation after the divorce proceedings began.[1] She explained: "What I understood about the situation was that things were to kind of remain as they were during our marriage even through our divorce proceedings," so Jim would pay for her expenses during the separation. She requested "an equal share" of "the property assets as a whole" and asked the court to not give any value to premarital assets.

The matter finally was tried to the court in late 2023. Carrie's expert witness Tedford Lodden evaluated the marital estate—including all of Jim's premarital assets and all his shared business assets—at around $9 million, with nearly $5 million in assets held by the Dahlstrom LLCs. Lodden examined and valued the

---

[1] At trial, she claimed a medical issue hampered her ability to work. Jim also claimed a serious medical issue. Neither provided any medical records to support the claim or affect distribution or support, so we do not consider it in our analysis.

marital assets and Jim's businesses by looking at records from 2021 through 2023. Lodden contacted Dahlstrom, Dahlstrom's accountant, and Jim's accountant trying to examine and understand the records for Jim's assorted ventures with Dahlstrom—the examination was complicated with unexpected transfers among the various LLCs. Among other things, Lodden observed a significant negative change in equity available to the Dahlstrom entities in late 2021 and early 2022, sales proceeds he couldn't track, and uneven distributions to Jim and Dahlstrom. Carrie asked for a cash and property settlement totaling around $4 million. Jim submitted a personal financial statement placing his net worth at just over $6 million, most of which was tied up in real estate investments—four properties he owned in his own LLC, the gas station property, and an estimated $2 million in assets for the Dahlstrom LLCs.

The district court issued a thorough and thoughtful decree, examining both parties' assertions about what was included in the marital finances. The court rejected Carrie's claims seeking to include Jim's premarital and business assets in the marital property distribution, noting Jim operated the assets before the marriage, during the marriage, and after the separation "without any identifiable active involvement from" Carrie, so any distribution of interest to her was "not equitable." The court also denied her request for half the value of the Carrie James gas station property, instead awarding her the 1% share of the net value based on her taxable ownership interest; the court also considered that Jim's premarital assets were still leveraged for the loans needed for the 20% down payment. The court awarded Jim the marital home (which he had owned before the marriage) and awarded Carrie one of Jim's paid-off rental houses—the house her parents

had rented for several years—worth approximately half the marital home's value. Carrie later opted for a cash equalization payment rather than the award of one of Jim's rental properties; the court calculated the appropriate settlement at $372,097.43 based on a one-half share of investment proceeds and Jim's personal funds. The court split equally the proceeds from the sale of the parties' Clear Lake home. Carrie also retained significant jewelry and luxury goods gifted to her and purchased during the marriage, three vehicles for herself and her children, and multiple homes' furnishings. In addition to the property and equalization payments, the court ordered three years of decreasing spousal support to transition and rehabilitate Carrie back into gainful employment. The court's calculations placed Carrie's distribution "in excess of $1 million in cash and assets." The court then denied Carrie's request for trial attorney and expert witness fees.

Carrie appeals the court's division of property and denial of her request for attorney and expert witness fees.

## II.     Standard of Review

A dissolution-of-marriage proceeding is heard in equity, and we generally review the resulting dissolution de novo. *In re Marriage of Gust*, 858 N.W.2d 402, 406 (Iowa 2015). "We give weight to the factual determinations made by the district court; however, their findings are not binding upon us." *Id.* "We will disturb the trial court's order only when there has been a failure to do equity." *Id.* (cleaned up).

## III.     Discussion

In dissolution-of-marriage cases, courts divide martial property equitably, considering the factors outlined in Iowa Code section 598.21 (2023). *In re*

*Marriage of Hansen*, 733 N.W.2d 683, 702 (Iowa 2007). What qualifies as an equitable distribution depends on the circumstances of each case, as "[a]n equitable division is not necessarily an equal division." *Id.*

### A. Division of Business Assets

Carrie first challenges the district court's division of assets, asking for more than $1.8 million in additional equalization payments. She argues the court's decision not to award her any of Jim's premarital or business assets was inequitable. The district court walked through the factors enumerated in Iowa Code section 598.21(5) when crafting its distribution of assets. In relation to premarital and shared business assets, Carrie focuses her challenges on the length of the marriage (section 598.21(5)(a)), the contributions made by each party to the marriage and earning power (section 598.21(5)(c) and (e)), and equitable principles (arguably section 598.21(5)(m)).

First, Carrie tries to include their relationship before marriage in the court's calculation to increase its duration for calculation of marital assets from short-term to ten years. As the district court recognized, we have previously rejected including a period of cohabitation as part of the marriage's duration for purposes of asset division. *In re Marriage of Naylor*, No. 17-0770, 2018 WL 5850223, at *3 (Iowa Ct. App. Nov. 7, 2018). And here, the parties did not even cohabit while dating before marriage, with Jim buying and renting a house to Carrie rather than the two moving in together. The time they dated does not extend the duration of the marriage under these circumstances.

Then Carrie argues she "actively participated in and helped grow Jim's businesses." But the record lacks any substantial evidence of significant

contributions by Carrie to Jim's personal ventures or their shared businesses.[2]  Jim testified that Carrie did not participate in his businesses, and his business partner Dahlstrom corroborated this testimony.  The parties agree Jim "told Carrie everything," but Carrie does not explain how Jim talking with her about his business was anything beyond typical conversations between spouses at the end of a work day.  And the evidence does not support Carrie's assertions she was a full participant in Jim's businesses, or that her status as his wife resulted in any beneficial change to his business practices.  Instead, Jim and Carrie's marital spending was such that Jim's business interests—both alone and with Dahlstrom– have not appreciated much in value because Jim largely cashed out those business gains to fund their lavish lifestyle.  We affirm the decree's determination Carrie is not entitled to half of Jim's share of assets from his businesses with Dahlstrom.

As for Carrie's claim that it is equitable to award her half of Jim's premarital assets for a relatively short marriage, we reject her argument.  We recognize "marriage does not come with a ledger" and each person's contributions "cannot be reduced to a dollar amount."  *In re Marriage of Fennelly & Breckenfelder*, 737 N.W.2d 97, 103–04 (Iowa 2007).  But we also bear in mind that when "there is a wide disparity between the assets of the parties at the time of the marriage the

---

[2] Despite clear direction in the rules of appellate procedure, Carrie's brief does not cite to the record to support her claim of contribution to counter the district court's findings.  *See* Iowa R. App. P. 6.903(2)(a)(8)(3).  Her "evidence" included emails sending her potential commissions as a real estate agent, the listing information on the house she had lived in for years, plans Jim wanted to review on Carrie's iPad rather than his phone, some marketing on a seasonal restaurant, and some general requests that appear related to managing their home or personal matters and not Jim's businesses.

length of the marriage is a major factor in determining the respective rights of the parties at the time of the dissolution." *In re Marriage of Dean*, 642 N.W.2d 321, 326 (Iowa Ct. App. 2002). And "the claim of a party to the premarital property owned by the other spouse in a short-term marriage is 'minimal at best.'" *In re Marriage of Hansen*, 886 N.W.2d 868, 872 (Iowa 2016) (citation omitted) (four years); *see In re Marriage of Peiffer*, No. 12-1746, 2013 WL 5498153, at *3 (Iowa Ct. App. Oct. 2, 2013) (seven years). In fact, "it is often equitable to simply award the property to the party that brought it into the marriage." *Hansen*, 886 N.W.2d at 873. Only the "appreciation in value" of the premarital assets during the marriage is a marital asset. Here, the appreciation in value found by the court consisted of the Clear Lake house proceeds and realized profit from one of Jim's investments. And the court awarded a property worth half the value of the marital home to Carrie.

Carrie asks on appeal for half the net value of the Carrie James LLC property (separate from the cash equalization she requested), increasing her share from 1% at $14,650 to 50% for $732,500—an additional distribution of $717,850. The district court made its division of Carrie James LLC based on the tax-return ownership percentages, reasoning they "are the only documentation of the parties' relevant ownership" and the court was "without other evidence on which to base this determination." And the court noted the downpayment was leveraged off Jim's assets, only his name was on the LLC management and the loan, and Carrie was not knowledgeable about the LLC she claimed to have a 50% interest in.

As far as ownership interests go, the tax returns support the court's determination Carrie owned 1% of the Carrie James LLC. We have no doubt these

parties do not wish to be in business together. Since Jim is the primary shareholder, it makes sense for him to buy Carrie out of the LLC. And a payment of 1% of the net value of the company was a fair price for her 1% share.

But this does not end our analysis—this is a marital asset with appreciation in net value wholly within the marriage. Jim told Carrie the LLC was "intended long term to eventually fund [their] lifestyle ongoing and [their] retirement." Carrie James LLC's creation was wholly during the marriage, with both Jim and Carrie listed as owners with no others. The purchase of the gas-station location occurred during the marriage, with the tax consequences shared by Jim and Carrie. The LLC's increase in value from zero to the court-determined net value of $1,465,000 occurred entirely during the marriage. We recognize that Jim did the lion's share of the work relating to the LLC, but the appreciation of the property appears to need very little ongoing effort on Jim's part. And the parties used the rental income (after mortgage payments) as marital funds to pay for their life together. We think these circumstances demonstrate the LLC and its assets are marital property.

So, in our view, equity demands Carrie be awarded part of the increase in value of the marital asset. *See Fennelly*, 737 N.W.2d at 103–04. But since the initial purchase of the asset would not have been possible without Jim's premarital property and banking connections and he did all the initial work to set up the LLC and the purchase, we think a reasonable amount to equalize their interests is to award Carrie one-third of the proceeds from the urged sale of the property. *See In re Marriage of Friedman*, 466 N.W.2d 689, 692–93 (Iowa 1991) (finding it "equitable to treat the appreciated value of the stock that we have deemed a marital asset in the same manner as the unappreciated values" to increase the minority

shareholding wife's distribution by another 10% of the value); *In re Marriage of Grady-Woods*, 577 N.W.2d 851, 853 (Iowa Ct. App. 1998) (splitting business appreciation 13% and 87% based on respective contributions). Starting with the district court's net valuation at $1,465,000, we also account for the taxes that would have been owed—somewhere around $675,000 between federal and state assessments—making the net amount to be divided $790,000. Carrie's third would be $263,333. We modify the decree to increase the cash equalization payment to Carrie by an additional $263,333 for her share of the appreciation in the marital asset.

### B. Trial Attorney and Expert Witness Fees

At trial, Carrie requested Jim pay her attorney and expert fees—more than $195,000 in attorney fees and more than $106,000 in expert fees at the time of trial. The district court denied the request, ordering each party to "pay their own attorney's fees [and] expert witness fees." The court determined the case's excessive motions, exhibits, experts, and depositions "arose more from the actions and positions of [Carrie] in this case than from the messy bookkeeping of [Jim]." The court found most of Carrie's excessive fees were incurred in her attempt to obtain a large share of Jim's premarital and non-marital business assets and determined she should bear those costs. On appeal, she only requests half her trial attorney fees and all the expert witness fees—a sum still exceeding $200,000. We note Jim already paid $12,000 of Carrie's attorney fees as part of the temporary matters order, and each party stipulated to both their attorneys receiving $12,000 from the Clear Lake house proceeds in a joint stipulation.

"The court has considerable discretion in awarding attorney fees" and "may consider expert fees in an award of attorney fees." *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 488 (Iowa 2012). We review the court's decision for an abuse of discretion. *In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). "We reverse the district court's ruling only when it rests on grounds that are clearly unreasonable or untenable." *In re Marriage of Erpelding*, 917 N.W.2d 235, 238 (Iowa 2018) (citation omitted). We understand why Carrie urges us to reverse the court's decision, but we do not find it unreasonable or untenable. We affirm the court's ruling.

### C. Appellate Attorney Fees

Carrie requests appellate attorney fees. She claimed she would "submit an attorney fee affidavit upon submission of this case for disposition." But she never did.

When deciding whether to award appellate fees, we consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal" in determining whether to award fees. *Sullins*, 715 N.W.2d at 255 (citation omitted). We decline to award Carrie any appellate attorney fees.

### IV. Disposition

We modify the distribution to increase the equalization payment to Carrie by $263,333 for the appreciation of the assets of marital property Carrie James LLC. We otherwise affirm the distribution of property and the district court's denial of expert and attorney fees. We decline to award Carrie appellate attorney fees.

**AFFIRMED AS MODIFIED.**